**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **T.L., AS PARENT/GUARDIAN/NEXT** | § | |
| **FRIEND OF J.M., A MINOR** | § | |
| **WITH A DISABILITY** | § | |
| | § | |
| **v.** | § | **1:18-CV-1016-RP** |
| | § | |
| **FLORENCE IND. SCHOOL DISTRICT** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE ROBERT PITMAN
        UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Motion for Judgment on the Administrative Record (Dkt.

No. 21); Plaintiff's Motion for Judgment on the Administrative Record (Dkt. No. 23); and the

various response and reply briefs.  The district judge referred the motion to the undersigned for a

report and recommendation pursuant to 28 U.S.C. § 636(b) and Rule 1(c) of Appendix C of the

Local Rules.

## I.   GENERAL BACKGROUND

This is an administrative appeal of a Special Education Hearing Officer's (SEHO) decision

under the Individuals with Disabilities in Education Act (IDEA).  On November 28, 2018, T.L., as

Parent/Guardian/Next Friend of minor J.M., filed the instant suit against Florence Independent

School District (FISD or the District), seeking a judgment reversing the SEHO's decision that FISD

did not violate the IDEA.  The District has cross-appealed seeking the affirmance of the SEHO's

decision, except as to its award of compensatory counseling services, which it requests the Court

reverse.

J.M., at the time of the administrative hearing, was an eighth grade student at Florence Middle School.  AR 8.[1]  J.M. began attending school in the Florence Independent School District in preschool.  *Id.*  Throughout his education, J.M. has exhibited behavioral difficulties.  AR 10; Tr. 313, 704.  J.M. qualified for and began receiving special education and related services from FISD as a student with an Intellectual Disability, Other Health Impairment, and Speech Impairment.  AR 8.  His diagnoses include autism, a complex seizure disorder, obsessive compulsive disorder, migraines, asthma, and nerve pain.  *Id.*  The parties agree that based on the IDEA's one-year statute of limitations, the relevant period for this action is May 10, 2017, to May 10, 2018.  *See* AR 54, 2259-2261, 2294-2295.

Beginning early in his sixth grade year at Florence Middle School,[2] J.M.'s behavior began to deteriorate.  In addition to outbursts, threats of aggression, and defiance when asked to do something that he did not want to do, J.M. developed a pattern of escape-motivated behaviors, "elopement" (leaving, or attempting to leave, the campus), and attendance issues.  AR 10-12, 2758, 3110-3111; Tr. 80-81, 126-127, 309-313, 643-644.  In September 2016, following an incident at school in which J.M. was physically restrained by a teacher, J.M. stopped attending school and missed most of the remainder of the 2016-2017 year.  AR 11.  In October 2016, FISD convened J.M.'s Admission, Review, and Dismissal (ARD)[3] Committee for a meeting to address the concerns

---

[1] Cites throughout this opinion will be to the Administrative Record (AR) or the Transcript (Tr.).  The Administrative Record and Transcript were filed under seal, and are contained in the exhibits to Dkt. No. 4.

[2] Though outside of the relevant time period for purposes of the statute of limitations, J.M.'s sixth grade year, 2016-2017, is relevant as background information for his timely claims.

[3] This area of the law uses numerous abbreviations. These are the ones used throughout this opinion:

related to J.M.'s behavior, attendance, and plan.  *Id.*  Following the meeting, FISD contracted a Behavior Interventionalist to conduct a Functional Behavioral Assessment (FBA) of J.M. in November 2016.  AR 11. The ARD Committee convened again in December 2016 to discuss the FBA results and address the ongoing concerns.  *Id.*  The Committee recommended a parent needs assessment to help facilitate J.M.'s return to school and discussed doing his three-year evaluations early to address the issues with J.M.'s needs.  *Id.*  J.M.'s guardian, T.L., declined to allow the evaluations do be conducted early.  *Id.*  In February 2017, the District contracted a Board Certified Behavior Analyst (BCBA) to conduct at-home parent training needs assessment with T.L. *Id.*  Then, in April 2017, the District had the same BCBA conduct another FBA of J.M.  AR 11-12.  The BCBA's reports made several assessments of J.M.'s behavior tendencies and made recommendations on how to avoid his negative behaviors, including adding to J.M.'s Behavior Intervention Plan (BIP) staff training on Applied Behavioral Analysis (ABA) strategies and family training.  AR 10-12.

Within the limitations period relevant to this action, J.M.'s most recent annual ARD Committee meeting was held on May 3, 2017.  AR 1059.  At this meeting, the ARD Committee

---

| | |
|---|---|
| ABA: | Applied Behavior Analysis |
| BCBA: | Board Certified Behavior Analyst |
| BIP: | Behavior Intervention Plan |
| ESY: | Extended School Year |
| FAPE: | Free Appropriate Public Education |
| FBA: | Functional Behavioral Assessment |
| FIE: | Full Individual Evaluation |
| IEP: | Individualized Education Program |
| LRE: | Least Restrictive Environment |
| LSSP: | Licensed Specialist in School Psychology |
| PLAAFP: | Present Levels of Academic Achievement and Functional Performance |
| RTF: | Residential Treatment Facility |
| SEHO: | Special Education Hearing Officer |

produced an Individualized Education Program (IEP) that included goals related to general education, as well as goals related to behavior, speech therapy, counseling and social skills, and special education services, such as a Behavior Intervention Plan (BIP), social skills training, occupational therapy, speech therapy, and counseling services in the special education setting.  *Id.* The IEP developed at the May 2017 ARD Committee meeting included present levels of academic achievement and functional performance (PLAAFP) for J.M., but because J.M. had not been attending school for most of the 2016-17 year, the statements contained data only from 2015 standardized tests.  AR 14.  In developing the IEP and BIP, the Committee also reviewed the results of the BCBA's April 2017 FBA, January 2017 parental needs assessment, and J.M.'s then-current BIP developed by the Interventionalist in November of 2016.  AR 15.

At the May 2017 meeting, the ARD Committee also discussed plans to transition J.M. back to attending school.  *Id.*  J.M.'s speech and language pathologist, occupational therapist, and Licensed Specialist in School Psychology (LSSP) all identified J.M.'s poor attendance as an obstacle to their ability to work with J.M.  AR 14.  The Committee recommended that J.M. participate in Extended School Year (ESY) services over the summer to work on J.M.'s behavioral issues and facilitate his return to school.  *Id.*  The District contracted the same BCBA to provide the ESY services, which included at home and in clinic sessions to reduce J.M.'s negative behaviors and help him begin attending school regularly.  AR 15-16.  On August 10, 2017, FISD held a staffing to address transitioning J.M. back to school.  AR 16.  T.L. attending the meeting, as did the BCBA to provide some recommendations and provide training for the FISD staff assigned to J.M.  AR 16. Specifically, the training provided direction to staff regarding J.M.'s BIP, Elopement Plan, and data collection.  *Id.*

4

J.M. returned to Florence Middle School for the 2017-2018 school year and quickly began exhibiting similar escape-motivated and elopement behavior. AR 16-17. In particular, since T.L. had provided J.M. with a cell phone, J.M. began calling T.L. to pick him up during the school day, or threatening to call T.L. when faced with a task that he did not want to do. *Id.* Numerous FISD staff identified J.M.'s phone use as a serious problem and impediment to J.M.'s school work and attendance. AR 17. Early on in the 2017-2018 school year J.M. also began exhibiting increased aggressive behavior. *Id.* Following incidents in September 2017 in which J.M. became physical with FISD staff members as well as an off campus incident with another student, J.M.'s ARD Committee met on October 11, 2017 to reconsider his IEP and placement. *Id.*

At the October 2017 meeting, the ARD Committee discussed the phone use as an obstacle to J.M.'s attendance. *Id.* The Committee also noted that J.M. was typically compliant in the mornings but deteriorated around and after lunch, identifying the loud and unstructured lunch environment as a potential trigger to the decline in J.M.'s behavior. *Id.* FISD's LSSP and the BCBA recommended the Committee consider placing J.M. in a more restrictive, self-contained setting to reduce his elopement behavior and escape-motivated behaviors. AR 17-20. T.L. approved of the new self-contained instructional setting, which was referred to as "Base Camp," where J.M. would be provided instruction by two adults, a certified education teacher and an instructional aide. AR 17-19. The Base Camp classroom was then developed specifically for J.M., including a sensory room with bean bags, dimmable lights, and hunting mural on one wall because J.M. was interesting in hunting. AR 18. T.L. also actively worked with the LSSP to prepare the classroom for J.M., including selecting paint and furnishings for the room. *Id.*

Although Base Camp was a self-contained placement outside of the general education setting, the LSSP and ARD Committee developed a system of behavior reinforcement by which J.M. could earn "out classes" in the general education environment, lunch with friends, or other rewards. *Id.* The District integrated J.M.'s ongoing progress report tracking with Base Camp through a "Daily Behavior Report Card" where J.M.'s behavior was rated each day both for the purposes of the reward system and for tracking J.M.'s behavior successes or challenges. AR 18-19. Within a month of J.M.'s placement in Base Camp, J.M. earned an "out class" with his peers through the reward system. AR 20. About a month after that, he earned a second "out class." *Id.* J.M.'s phone use, however, continued to be an issue in Base Camp. *Id.*

Although T.L. originally approved of J.M.'s placement in Base Camp, after a few months T.L. began expressing concerns over the placement and J.M.'s educational program. AR 20-21. In November 2017, T.L. requested the District consider a residential treatment program. *Id.* On December 4, 2017, the ARD Committee held a meeting at T.L.'s request to address her concerns. AR 21. At the time, J.M.'s IEP, BIP, and PLAAFs had not been updated since the May 2017 meeting. *Id.* The ARD Committee recommended conducting updated evaluations and assessments of J.M., however T.L. declined further testing and requested the District not communicate any further with J.M.'s providers. *Id.* On January 10, 2018 the ARD Committee reconvened. AR 21. T.L. again expressed concerns with having J.M. reevaluated. *Id.* Though T.L. expressed her disagreement, ultimately, FISD and T.L. agreed to continue J.M.'s plan as set forth in his October 2017 IEP. *Id.*

From January-April 2018, J.M. continued attending school and receiving instruction in Base Camp. AR 22. Although he continued to miss days of school, his attendance improved, and he

passed his Texas Assessment of Academic Readiness (STARR) tests given in April 2018.  *Id.*  On April 17, 2018, J.M. became physical with his educational aide and was restrained.  *Id.*  J.M. subsequently stopped coming to school for the remainder of the 2017-18 year.  *Id.*  On May 10, 2018, T.L. filed a request for a due process hearing with the Texas Education Agency (TEA).  AR 3.

On May 15, 2018, J.M.'s ARD Committee convened at T.L.'s request to discuss the April 2018 restraint of J.M. by his aide.  *Id.*  At the meeting, T.L. again requested the District consider residential placement for J.M., suggesting placement at the Bayes Achievement Center.  *Id.*  The Committee declined, explaining in its Prior Written Notice following the meeting that J.M.'s needs did not rise to the level of requiring residential placement.  AR 23.  The District offered ESY services for summer 2018, which T.L. declined.  *Id.*

The due process hearing was held September 11-13, 2018, and the SEHO issued her opinion on October 29, 2018.  AR 3.  Following the three-day hearing, the SEHO concluded that J.M. did not meet his burden to show that FISD failed to provide a FAPE or that the District violated the IDEA.  AR 24-42.  Despite the SEHO finding that the findings of facts and conclusions of law weighed in favor of the District, the SEHO granted J.M. 21 compensatory hours of counseling services which the SEHO found FISD had failed to provide.  AR 42.

On November 28, 2018, T.L. sued FISD on behalf of J.M., appealing the decision of the SEHO.  Dkt. No. 1.  J.M. challenged the following findings of the SEHO: (1) that no procedural violations of the IDEA occurred; (2) that no substantive violations of the IDEA occurred; (3) that FISD did not deny Student a FAPE; (4) that FISD did not violate the IDEA; and (5) the rejection of the claim that the Bayes Achievement Center was a proper placement for J.M.

J.M. now seeks summary judgment on his claims, seeking to reverse the decision of the SEHO. Dkt. No. 23. FISD also seeks a judgment, asking the Court to affirm the SEHO's decision, except to the extent it awarded 21 hours of compensatory counseling services, on which the District seeks reversal. Dkt. No. 21.

## II. LEGAL STANDARD

The IDEA was enacted to ensure that "[a] free appropriate public education is available to all children with disabilities." 20 U.S.C. § 1412(a)(1)(A). The IDEA compels those states receiving federal funding to educate children with disabilities to the maximum extent appropriate with children who are not disabled, 20 U.S.C.S. § 1412(a)(5), and to do so in the least restrictive environment consistent with their needs. *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 922 (W.D. Tex. 2008). In exchange for such funds, states pledge to ensure a free appropriate public education ("FAPE") is available to all children with disabilities residing in the state between the ages of 3 and 21. 20 U.S.C.S. § 1412(a)(1)(A). Because Texas receives federal education funding, all school districts within its borders must comply with the IDEA. *Richard R.*, 567 F. Supp. 2d at 922.

Once a school accepts that one of its students is eligible under the IDEA, the school must develop an individualized educational program ("IEP") for that student. *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 306 (5th Cir. 2017). The IEP is a written statement, prepared at a meeting of qualified representatives of the local educational agency, the child's teacher, parent(s), and where appropriate, the child. 20 U.S.C. § 1414(d). To ensure that each student receives a FAPE, school districts must collaborate with parents to develop and implement an IEP that is "reasonably calculated to enable the child to receive educational benefits." 20 U.S.C. § 1400(d)(1)(A); *R.H v. Plano Indep. School Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010). While the FAPE need not be the

8

best possible one, nor one that will maximize the child's educational potential, it must be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him or her "to benefit" from the instruction. *Richard R.*, 567 F. Supp. 2d at 922. To determine whether the IEP is "reasonably calculated to enable the child to receive educational benefits," courts must evaluate four factors: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) whether there was positive academic and non-academic benefits demonstrated. *Cypress-Fairbanks Indep. School Dist. v. Michael F.*, 118 F.3d 245, 248, 253 (5th Cir. 1997).

Under the IDEA, any party aggrieved by a decision of a Special Education Hearing Officer ("SEHO") has the right to appeal the decision to the district court. 20 U.S.C. § 1415(i)(1)(A). On appeal, "the Court shall: (1) receive the records of the administrative proceedings; (2) hear additional evidence at the request of the party; and (3) grant such relief as it determines appropriate based upon the preponderance of the evidence." *Z.C. v. Killeen Indep. Sch. Dist.*, 2015 WL 11123347, at *5 (W.D. Tex. Feb. 17, 2015) (citing 20 U.S.C. § 1415(i)(2)(C)). Though nominally a motion for summary judgment, an IDEA appeal "essentially asks the Court to decide the case based on the administrative record." *Caldwell Indep. Sch. Dist. v. L.P.*, 994 F. Supp. 2d 811, 817 (W.D. Tex. 2012). The district court's review of a SEHO's decision "is virtually *de novo*. That is, although the district court is to give due weight to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 213 (5th Cir. 2019). *See also R. S. v. Highland Park Indep. Sch. Dist.*, 951

F.3d. 319, 328 (5th Cir. 2020) ("Although the district court is required to give due weight to the hearing officer's findings, the [district] court ultimately must arrive at its own independent decision based on the preponderance of the evidence."). This standard, however, "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.*

In general, summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343

(5th Cir. 2007).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *Id.*  The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim.  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).  If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

### III. ANALYSIS

A district court's review of a SEHO's decision is twofold: the court must (1) determine whether the School District complied with the IDEA's procedural requirements, and (2) then determine if the student's IEP is reasonably calculated to provide meaningful educational benefits.  *Rowley*, 458 U.S. at 177.  In this case, J.M. asserts the District denied him a FAPE in 2017-2018 by violating both the procedural safeguards and substantive provisions of the IDEA.

**A.     Procedural Requirements**

J.M. alleges that the SEHO erred by not finding that FISD violated the procedural requirements of IDEA.  Specifically, J.M. asserts that FISD violated rules regarding progress reports and prior written notice.  Dkt. No. 1 at ¶ 165.

The IDEA "imposes extensive procedural requirements designed to 'guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decision they think inappropriate."  *Buser by Buser v. Corpus Christi Indep. Sch.*, 51 F.3d 490, 493 (5th Cir. 1995) (citing *Honig v. Doe*, 484 U.S. 305, 311-312, 108 S.Ct. 592, 98 L.Ed.2d 686 (1987)).  Procedural requirements include such matters as being given proper notice

11

of meetings, releasing test evaluations and behavior reports, and providing independent evaluation upon request. *Ruffin v. Houston Indep. Sch. Dist.*, 459 Fed.Appx. 358, 364 (5th Cir. 2012). Nevertheless "'procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of educational opportunity.'" *Alamo Heights Indep. Sch. Dist.*, 703 F.3d at 810 (quoting *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003)).

First, the Court addresses J.M.'s argument that FISD failed to comply with the procedural requirements of IDEA by failing to provide progress reports. In his Complaint, J.M. asserts that FISD failed to provide T.L. with regular reports as to J.M.s' progress. Dkt. No. 1 at ¶ 165; Dkt. No. 23 at 17. This argument, however, is not supported by the record. For example, T.L. was provided with reports on May 25, 2017, October 13, 2017, December 15, 2017, March 9, 2018, and May 29, 2018. AR 1281-1300. She also received a report on J.M.'s progress during the individualized ESY services in summer 2017. AR 1056-1058. Further, FISD maintained daily behavior report cards to assess whether J.M. was progressing with behavior and whether any improvements could be made. AR 2041-2043, 2473-2476, 1266-1267. FISD provided these daily reports to T.L. *Id.* In sum, J.M.'s assertion that FISD failed to provide regular progress reports is contradicted by the evidence that FISD frequently kept and provided T.L. with reports.

J.M. also asserts procedural deficiencies with respect to prior written notice. IDEA requires that prior written notice be given to a student's guardian "whenever the local education agency—(A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free public education to the child." 20 U.S.C. § 1415(b)(3). J.M. alleges FISD failed to comply with this requirement. Dkt. No. 1 at ¶ 165; Dkt. No. 23 at 17. Contrary to J.M.'s argument, the record shows that prior written notice was

12

issued for each ARDC meeting during the relevant time period.  *See* AR 1090, 1137, 1158, 1465, 2236, 2950.  Accordingly, the District complied with the IDEA's prior written notice requirement.

Because the Court finds the District did not commit any procedural violations of the IDEA, it need not address whether any procedural violation impeded J.M.'s right to a FAPE or T.L.'s opportunity to participate in the decision-making process, or deprived J.M. of educational benefits.

## B.    Substantive Requirements

Next, the Court turns to J.M.'s substantive claims.  At this second step of the analysis, a court looks to four factors to determine whether the IEP was reasonably calculated:

> (1) Is the program individualized on the basis of the student's assessment and performance; (2) is the program administered in the least restrictive environment; (3) are the services provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) are positive academic and non-academic benefits demonstrated?

*R.H. v. Plano*, 607 F.3d at 1012.  "[T]hese factors are 'indicators' of an IEP's appropriateness" and are only "intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit."  *Michael Z.*, 580 F.3d at 294.

### 1.    Individualized on the Basis of Assessment and Performance

The majority of J.M.'s complaints involve the first factor, whether the District provided J.M. with a program that is individualized on the basis of his assessment and performance. An IEP is sufficiently individualized when multiple assessments are conducted of the student, the ARD Committee considers these assessments, as well as guardian and teacher input, in developing the student's IEP, accommodations and modifications are made based on the student's performance and guardian input, and the IEP goals are revised or added to based on new assessment data.  *Z.C. v. Killeen Indep. Sch. Dist.*, 2015 WL 11123347, at *6 (W.D. Tex. Feb. 17, 2015).  The IEP should

13

include the child's "present levels of academic achievement and functional performance ("PLAAFP"). 34 C.F.R. § 1414(d)(1)(A)(i). The PLAAFP include "how the child's disability affects the child's involvement and progress in the general education curriculum." *Id.* The IEP should also include "a statement of measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting the annual goals . . .will be measured." *Id.* The IEP must describe the "special education and related services . . . that will be provided so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." *Id.*

Here, J.M. does not argue that FISD failed to conduct evaluations and assessments, as the record clearly indicates it did. Rather, he asserts that his IEPs were not based on accurate, updated data regarding his performance. Dkt. No. 23 at 12-14. J.M. specifically points to the fact that his PLAAFPs were not updated during the 2017-18 school year, and complains that the ARD Committee relied on outdated PLAAFP information from 2015-16 in developing his IEPs. *Id.* J.M. does not identify case law or other support for the claim that an IEP based on historical performance data would, on its own, constitute a violation of IDEA.

The SEHO found, and the Court concurs, that J.M.'s IEPs were sufficiently individualized based on his assessments and performance. AR 28-29. The SEHO notes that the ARD Committee's use of prior PLAAFPS to develop the May 2017 IEP was primarily due to J.M.'s poor attendance during the preceding school year. AR 28.[4] Further, each time that J.M.'s plan was updated during the 2017-18 year, the record shows that the ARD Committee considered his performance and chose

---

[4] *See* AR 2465-2467, 2476-2477, 2528, 2558, 2747-2748, 2771, 2775-2779, 3101-3103, 3184-3186 (documenting T.L.'s, behavior in dropping J.M. off late at school, picking him up early from school upon his request, and refusing to bring J.M. to school for unpredictable lengths of time).

not to update his PLAAFPs.[5]  Thus the record undermines any claim that J.M.'s IEPs were based on old, inadequate performance data.  *See Renee J. v. Houston Indep. Sch. Dist.*, 333 F. Supp. 3d 674, 696 (S.D. Tex. 2017), *aff'd* 13 F.3d 523 (5th Cir. 2019) (finding that IEP based on historical data was still sufficiently individualized where the Committee considered the student's performance levels, as well as the impact of the student's extended absence).

The evidence shows that proper evaluations were conducted, FISD considered those evaluations, plus input from T.L. and J.M.'s teachers, and developed programs specifically individualized to address J.M.'s unique needs.  The ARD Committee met frequently—far more frequently than required by the Act—reviewed each and every evaluation and assessment, and developed specific accommodations, services, and strategies in response to the evaluations, assessments, progress reports and observations of J.M., and T.L.'s concerns.  *See C.G. v. Waller Indep. Sch. Dist.*, 697 F. App'x 816, 820 (5th Cir. 2017) (noting favorably that the school district "adjusted its strategies [for addressing the student's needs] multiple times, including altering [her] school day in response to her parents' many concerns").  In sum, the record shows that J.M.'s IEPs were sufficiently individualized and factor one weighs in favor of the School District.  *See, e.g., C.G. Waller Indep. Sch. Dist.*, 2016 WL 3144161, at *6-7 (S.D. Tex. June 6, 2016), *aff'd* 697 F. App'x 816, 820 (5th Cir. 2017); *C.M. v. Warren Indep. Dist.*, 2017 WL 4479613, at *12 (E.D. Tex. Apr. 18, 2017); *Shafi v. Lewisville Indep. Sch. Dist.*, 2016 WL 7242768, at *6 (E.D. Tex. Dec. 15, 2016) (each finding the child's IEP was sufficiently individualized where the IEP was based on multiple

---

[5]     *See* AR 1088, 1132-1135, 2518-2519, 2549, 2565-2566 (indicating ARD Committee considered J.M.'s present performance at each meeting to adjust his IEP and explaining the decision not to update his PLAAFPs).  *See also* AR 1664-1816 (various text message communications between T.L. and the District's LSSP, a member of the ARD Committee, regarding J.M.'s present levels of performance and progress).

assessments and evaluations performed on the child and IEP strategies were discussed with the child's parent).

### 2.      Least Restrictive Environment

J.M. also asserts that his IEP failed the least restrictive environment (LRE) element.   This factor uses a two-part test.   The court first asks "whether education in the regular classroom, with the use of supplemental aids and services can be achieved satisfactorily for a given child." *R.H.*, 607 F.3d at 1013 (citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)).   If not, the second question is "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.*

The record shows that J.M.'s IEP was administered in the least restrictive environment.   J.M. began the 2017-18 school year placed in a combination of general and special education classes.   *See* AR 821 (setting a schedule for J.M. in general education, with supports of an instructional aide, smaller classes, and lessened academic demands).   However, beginning in October 2017, the IEP was updated to place J.M. in a self-contained instructional setting called Base Camp.   AR 1132-1144, 2461, 3204.   Base Camp provided for a 2:1 special education instructional setting, with a special education teacher and an aide, as well as a sensory room developed specifically for J.M.   *Id.;* AR 1311-1317.   This placement also provided a behavioral reward system for J.M. to earn rewards such as "out classes" in the general education setting and other rewards.   *Id.*   After T.L. expressed concerns about the placement's lack of access to peers, the ARD Committee responded by amending the program to include a "lunch bunch" where J.M. could select two friends to join him for lunch each day.   Tr. 331, 586, 590, 758.   Although it was a self-contained instructional setting, Base Camp is a classroom on the regular Florence Middle School Campus, and the record shows that J.M.

interacted with peers in a number of different ways under the program.  In addition to the "lunch bunch," while in Base Camp J.M. also received small-group services through the use of a "restorative circle," where friends explained to him why they were upset with his behavior in a particular situation, to help J.M. understand how his behaviors impact others.  AR 1133.[6]

Based on J.M.'s demonstrated inability to receive instruction in the general education environment, including his increased tendency to elope from the campus, increased aggression towards staff and failure to complete work even with the supports in place and aide, the SEHO correctly concluded that placement in the general education classroom was not appropriate.  AR 32. The record supports the SEHO's determination that the District established Base Camp specifically taking into consideration the least restrictive setting possible for J.M., and continued to adapt the program to balance J.M.'s needs.  Any argument that J.M.'s IEP was not was not administered in the least restrictive environment is not supported by the record.

### 3.      IEP Created and Implemented in a Coordinated Collaborative Manner

J.M. also raises claims that his IEPs were not created and implemented in a coordinated or collaborative manner by the key stakeholders.  This factor requires a variety of individuals, including persons with personal relationships to the student and school district employees, to work together to jointly develop the student's IEP.   *Michael F.*, 118 F.3d at 253. (finding the third factor met where the student's IEP "involved both [the student's] individual teachers and the school district's administrators and counselors familiar with his needs in a highly coordinated and collaborated

---

[6] The Court notes here that the greatest obstacle to J.M.'s interaction with other students was his excessive absence from school, which deprived him of any integration with his peers.  Further, T.L. requested to place J.M. in a residential treatment center—which is the most restrictive placement possible and without question more restrictive than the Base Camp program she challenges. *See Michael Z.*, 580 F.3d at 299.  19 TEX. ADMIN. CODE § 89.63(c)(10).

effort"). Furthermore, simply because disagreement exists between the guardian and the School District as to the proper services to provide does not mean that the factor is not met. *R.C. ex rel S.K. D.H. v. Keller Indep. Sch. Dist.*, 958 F. Supp. 2d 718, 736-737 (N.D. Tex. 2013). "Absent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the [parents'] input, [a school district] has met IDEA requirements with respect to parental input." *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003).

Here, the required participants attended all the ARD Committee meetings, and T.L. was fully informed about J.M.'s status throughout his enrollment in FISD. The record is replete with communications demonstrating that FISD and T.L. developed J.M.'s IEP over numerous meetings in a collaborative and coordinated manner, in meetings with the ARD Committee, FISD staff, administrators, and T.L. AR 11, 34, 2459, 2464, 1555-1816, 2459-2464, 2467-2468. Moreover, the ARD Committee worked with staff trained in Applied Behavioral Analysis, J.M.'s occupational therapist, LSSP and BCBA in designing a program and setting that worked for J.M.'s specific sensory needs. AR 35, 37. In sum, the record shows that T.L. was present for each ARD Committee meeting in the relevant time period, and was given the opportunity to, and actively did, participate in the process of developing the IEP.

J.M. argues that, in considering whether the IEP was created and implemented in a coordinated and collaborative manner, the SEHO erred by failing to consider the fact that FISD's attorney attended ARD Committee meetings, and the impact that had on the meetings. This argument is unavailing. J.M.. cites no authority indicating that a school district's attorney may not be present at ARD Committee meetings, nor any evidence that the attorney's presence undermined or prevented collaboration or cooperation between FISD, the ARD Committee, and T.L  Contrary to J.M.'s

allegations, as discussed above, the SEHO found ample evidence of coordination and collaboration. AR 34-37, 39.

It is important to emphasize that while FISD was obligated to collaborate with T.L. in its decision making, the duty of collaboration did not require FISD to defer to T.L.'s demands for a particular method of addressing J.M.'s disabilities. *White*, 343 F.3d at 380 (a parent's "right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such.") (citing *Blackmon v. Springfield R–XII Sch. Dist.*, 198 F.3d 648, 656 (8th Cir. 1999). Here, the record shows J.M's IEPs were developed and implemented in a collaborative and cooperative manner. That the IEP ultimately selected was not T.L.'s preferred outcome—a residential treatment program—does not negate the ample evidence that J.M.'s IEP was developed and implemented in the manner required by the IDEA.

### 4.   Positive Academic and Non-Academic Benefits

The fourth factor, whether a program is designed to provide the student positive academic and non-academic benefits, is "one of the most critical factors in this analysis." *V.P.*, 582 F.3d at 588. Courts determine whether academic and non-academic benefits resulted from a student's IEP by looking to the individual student's progress or regress, rather than by comparison to the academic progress achieved by the student's peers. *Bobby R.*, 200 F.3d at 349. The *Bobby R.* Court found that academic benefits were shown where the student's test scores improved and the student progressed grade levels each year. *Id.* at 349-50. Notably, the court in *Bobby R.* found that this fourth factor was met when only an educational benefit had been demonstrated. Similarly, other courts have found that the fourth factor can be met in cases where only non-academic benefits, such as behavioral improvements or improvements in social and interpersonal skills, are demonstrated. *A.B.*

*v. Clear Creek Indep. Sch. Dist.*, 2018 WL 4680564, at *5 (S.D. Tex. Sept. 28, 2018) *aff'd*, 787 F.App'x 217 (5th Cir. 2019).   Under Supreme Court and Fifth Circuit precedent, the question here is not whether J.M. maximized his educational potential in the 2017-2018 year, but rather is whether he demonstrated more than *de minimus* positive academic and non-academic benefits.   *See Michael F.*, 118 F.3d at 248.   No bright-line rule establishes the benchmark benefits needed to satisfy this factor.   Rather, "[t]he adequacy of a given [Plan] turns on the unique circumstances of the child for whom it was created."   *Endrew F.*, 137 S.Ct. at 1001.

The SEHO concluded that J.M.'s IEP was reasonably calculated to provide him positive academic and non-academic benefits.   The record supports this conclusion.   Despite the "tremendous barrier" that J.M.'s poor attendance posed to his ability to make consistent behavioral and academic progress,[7] J.M.'s progress reports, academic testing, and attendance records indicate he nonetheless achieved some progress in the 2017-18 year.   AR 37.   J.M. passed his classes for the 2017-18 school year with As and Bs on his modified assignments.   AR 1301-1302.   He also passed the reading and writing areas of his modified STAAR tests with "accomplished" scores and passed the mathematics section with a "satisfactory" score.   AR 1303-1304.   His attendance record during the 2017-18 year improved compared to the previous year, during which J.M. attended only approximately 20 days of school.   AR 37.   While J.M. still engaged in elopement behaviors and his phone use remained an issue during the 2017-18 year, on the whole J.M. also showed behavioral progress.   *See, e.g.*, AR 1133, 2233; Tr. 587.

---

[7] As has been mentioned, the evidence suggests that the biggest impediment to J.M.'s educational progress was his poor attendance. AR 1133, 1170-1176, 2476-2477.

The core of the IDEA is to provide access to educational opportunities, and requires only the "basic floor of opportunity," and more than *de minimus* meaningful educational benefits, not a perfect education and not the maximization of a student's potential.  Considering J.M.'s progress when he did attend school, the positive feedback from teachers, the observations of evaluators, and the opinion of the SEHO who had the opportunity to observe witnesses and make credibility determinations, the Court concludes that J.M. gained measurable educational benefits sufficient to comply with the IDEA.[8]  Accordingly, J.M. has failed to show, by a preponderance of the evidence, that FISD denied him a FAPE due to a lack of progress in academic and non-academic areas, and the fourth factor weighs in favor of FISD.

"The IDEA guarantees an appropriate education, not a perfect education.*"  Spring Branch,* 2017 WL 3017282, at *29.  J.M. did not receive a perfect education, but the record supports the SEHO's determination that the School District provided J.M. with IEPs and services that were reasonably calculated to, and did, result in meaningful academic and non-academic benefits.  The record fails to demonstrate substantive violations that denied J.M. his right to a FAPE.

## C.    Award of Counseling

Having concluded that the SEHO did not err in finding that FISD provided J.M. with a FAPE for the 2017-18 school year, the Court turns to the District's sole point of dispute with the SEHO's decision, the award of 21 hours of compensatory counseling.  As discussed above, FISD's motion

---

[8] At the due process hearing, J.M.'s expert testified that it was her opinion that J.M.'s placement was not "the best" because he was not making "a lot" of progress."  Tr. 473, 475.  This is not the measure required by the IDEA, however, as the progress needs to only be more than *de minimus*.

contends that the SEHO correctly found no violation of the IDEA, but asserts that the SEHO lacked authority to award of 21 hours of compensatory services.  Dkt. No. 21 at ¶ 23.  The Court agrees.

The SEHO's decision concluded that J.M. "did not receive the counseling services provided by his IEP and is entitled to compensatory education," but also noted that "[d]espite this deficit, the District provided [J.M.] FAPE."  AR 42.  As the SEHO correctly noted, a school district's failure to provide every service and modification in a student's IEP does not constitute a *per se* violation of the IDEA.  Rather, "to prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities *failed to implement substantial or significant provisions of the IEP*."  *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) (emphasis added).  Here, the SEHO found that FISD failed to provide J.M. with all of the counseling hours called for by his IEP.  AR 42.  Nonetheless, the SEHO also found that despite this deficit, the District provided J.M. with a FAPE and thus did not violate the IDEA.  In other words, the SEHO found that T.L. did not prove that the failure to provide the counseling hours constituted a failure to implement substantial or significant portions of J.M.'s IEP.  *See Bobby R.*, 200 F.3d at 349. As noted above, the Court concurs with the SEHO on this point—the record does not show that the lack of counseling hours rose to such a level as to constitute a failure to implement J.M.'s IEP.

Given the SEHO's conclusion that FISD provided J.M. a FAPE and did not violate the IDEA, his grant of a compensatory award was not justified or permitted by the IDEA.  Compensatory awards are equitable remedies that SEHOs or courts may award when "appropriate" to remedy violations of the IDEA. *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994).  Compensatory awards are intended  "prospectively to compensate for a past deficient

program." *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1290 (11th Cir. 2008). Such awards "should place children in the position they would have been in but for the violation of the Act." *Id.* at 1289 (citing *Reid ex rel Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)). The SEHO's conclusion that FISD did not violate the Act precluded her ability to grant any compensatory relief. *See Spring Branch Indep. Sch. Dist. v. O.W. by Hannah W.*, 961 F.3d 781, 800 (5th Cir. 2020) ("To the extent the hearing officer and district court awarded tuition reimbursement for a time period for which there was no corresponding finding of an IDEA violation (the 2015-2016 school year), such an award appears to have been in error."). Absent a violation of the IDEA, there was nothing to compensate. The undersigned thus recommends granting FISD's motion and reversing the SEHO's award of compensatory counseling services.

**D.    Attorney's Fees**

Lastly, FISD's motion requests an award of attorney's fees. Traditionally, under the American rule, "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.LP. v. ASARCO LLC*, 135 S. Ct. 2158, 2161 (2015). Accordingly, "[a] district court may not award attorneys' fees 'unless a statute or contract provides' the basis for such an award." *Spear Mktg., Inc. v. BancorpSouth Bank*, 844 F.3d 464, 470 (5th Cir. 2016) (quoting *Baker Botts*, 135 S.Ct. at 2164). Federal Rule of Civil Procedure 54(d)(2) provides the procedure for the prevailing party, by motion, to specify the statute, rule, or other grounds entitling them to the award. FED. R. CIV. P. 54(d)(2)*. See White v. Reg'l Adjustment Bureau, Inc.*, No. 3:11-CV-1817-B, 2013 WL 12175083, at * 4 (N. D. Tex. June 16, 2013).

The IDEA authorizes courts to award attorney's fees to prevailing defendant school districts in limited circumstances, such as where a plaintiff brings a frivolous complaint or continues

23

litigation for an improper purpose.  20 U.S.C.A. § 1415(i)(3)(B)(i).  "In making this determination, the focus is on the merits of the case rather than its outcome."  *Capital City Pub. Charter Sch. v. Gambale*, 27 F. Supp. 3d 121, 133 (D.D.C. 2014).   In other words, the complaint must have been baseless from the beginning.  Awards of attorney's fees to defendant school districts in IDEA cases are uncommon.  Generally, fees are only awarded in cases of egregious failures of counsel.  For example, in *El Paso Indep. Sch. Dist. v. Berry*, the Fifth Circuit affirmed a District Court's award of attorneys' fees to a defendant school district based on the plaintiff's counsel's "repeatedly prolonging litigation and stonewalling efforts to conclude it to the detriment of his client." 400 Fed.App'x. 947, 955 (5th Cir. 2010) (unpublished).  Even where a school district can establish that it is prevailing and establish one of the limited grounds for a fee award, courts have discretion on the amount, if any, to award.  20 U.S.C.A. § 1415(i)(3)(C).

FISD's Motion for Judgment on the Administrative Record requests the Court "grant FISD, as prevailing party (and due to Plaintiff's unreasonable protraction of these proceedings), its reasonable and necessary costs."  Dkt. No. 21 at 24.  The District does not specify any further support for its claim to fees, nor does it identify a specific amount of fees which it seeks.  Having reviewed the entire record, the undersigned cannot find the type of factual basis that would support such an award.  The undersigned thus recommends the District Court deny FISD's request for attorney's fees.

### III. RECOMMENDATION

In accordance with the foregoing discussion, the Court **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Administrative Record and for Partial Summary Judgment (Dkt. No. 23), and **GRANT IN PART** and **DENY IN PART** Defendant's

Motion for Summary Judgment (Dkt. No. 21).  Specifically, the Court **RECOMMENDS** that the District Court **GRANT** the Defendant's motion and **AFFIRM** the Special Education Hearing Officer's findings that:

(1)     FISD provided a FAPE;
(2)     FISD did not violate the IDEA.

However, the Court **RECOMMENDS** that the District Court **REVERSE** the Special Education Hearing Officer's finding on the issue of compensatory counseling hours.  Lastly, the undersigned **RECOMMENDS** the District Court **DENY** the Defendant's request for attorney's fees.

The Clerk is directed to remove this case from the Magistrate Judge's docket and return it to the docket of the Honorable Robert Pitman.

## V.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).  A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See* 28 U.S.C. § 636(b)(1)(c) (2006);  *Thomas v. Arn*, 474 U.S. 140, 150-153 (1985);  *Lisson v. O'Hare*, 326 F. App'x 259, 260 (5th Cir. 2009).

SIGNED this 31st day of July, 2020.

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE